**International Textbook Company Appeal**

*Shelden, Rosenberg, Nogi, O'Malley & Harris,* for appellant.

*Morley W. Baker,* Assistant Attorney General and *William C. Sennett,* Attorney General, for respondent.

KREIDER, P. J., December 19, 1969.—This is an appeal filed by International Textbook Company, a Pennsylvania corporation with its principal place of business in Scranton, Pa., from an order of the Bureau of Employment Security of the Pennsylvania Department of Labor and Industry denying appellant's petition for reassessment. The basis of the original assessment in the amount of $187.20, with interest of $25, was that certain amounts of money paid to William

W. Manville by appellant in the operation of its business during the period in question should have been included in its contribution reports as "wages" paid for "employment" as defined by the Pennsylvania Unemployment Compensation Law of December 5, 1936, Second Extraordinary Session, P. L. (1937) 2897, as amended, 43 PS §751, et seq., and, therefore, subject to tax.

Manville, whose remuneration is in question during the period November 1, 1965, through July 31, 1967, was employed by Haddon Craftsmen, Inc., a wholly-owned subsidiary of appellant, International Textbook Company, as an administrative engineer under a renewable annual contract from November 1, 1950, until October 30, 1965. During this period, Mr. Manville was admittedly in the status of an employe and contributions were paid on the wages received by him. Prior to November 1, 1950, he had been an employe of Stevenson, Jordan & Harrison, a consulting engineering firm.

As of October 31, 1965, Mr. Manville's position with appellant was abolished. However, he was hired thereafter by appellant allegedly as a "consultant" industrial engineer under a 90-day contract which was *renewed* on *seven* consecutive occasions. The last such renewal expired July 31, 1967.

Some time during the month of August 1967, Mr. Manville filed an application for benefits under the provisions of the Pennsylvania Unemployment Compensation Law. This application established for him a base year consisting of the last three quarters of 1966 and the first quarter of 1967. Thereafter, the Bureau of Employment Security issued its decision holding that Mr. Manville was not financially eligible for benefits for the reason that he had no reported wages during his base year.

As a consequence of this denial and Mr. Manville's protest with respect thereto, the Bureau of Employ-

ment Security, pursuant to the provisions of section 304 of the Pennsylvania Unemployment Compensation Law, issued a notice of assessment against appellant for failure to include in its quarterly contribution reports the remuneration received by Mr. Manville. Following this notice, appellant filed a petition for reassessment, alleging that during the period in question Mr. Manville was not its employe but was an "independent contractor" and that the moneys received by him were not "wages" within the meaning of the statute.

A hearing was held by the bureau's examiner on said petition. He concluded that, as a matter of law, "The services performed by William Manville did constitute 'employment' within the meaning of section 4 (1)(2)(B) of the Law, and the remuneration received therefor did constitute 'wages' subject to the contribution provisions of the Law," and recommended that the petition for reassessment be dismissed. Thereafter, the bureau issued its decision dismissing appellant's petition. From that decision an appeal to this court was filed.

Relevant sections of the Pennsylvania Unemployment Compensation Law of December 5, 1936, Second Extraordinary Session, P. L. (1937) 2897, as amended, 43 PS §751, et seq., are as follows:

Section 4(x):

" 'Wages' means all remuneration, (including the cash value of mediums of payment other than cash), paid by an employer to an individual with respect to his employment . . ."

Section 4(j):

"(1) 'Employer' means every—individual . . . who or which employed or employs any employe in employment subject to this act . . ."

Section 4(1)(1):

" 'Employment' means all personal service performed for remuneration by an individual under any

contract for hire, express or implied, written or oral,
. . ."

The exclusionary provisions of section 4(l)(2)(B), provide, in pertinent part, as follows:

"Services performed by an individual for wages shall be deemed to be employment subject to this act, unless and until it is shown to the satisfaction of the department that—(a) such individual has been and will continue to be free from control or direction over the performance of such services both under his contract of service and in fact; and (b) as to such services such individual is customarily engaged in an independently established trade, occupation, profession or business."

There is no question that Manville performed services for appellant and received remuneration. Unless appellant can show that both requirements, viz., (a) and (b), of the above exclusionary exempting provisions are met, the remuneration paid will be considered "wages" subject to the act.

Since Manville was performing services for remuneration, the burden shifts to appellant to bring itself within either the general exception set forth in section 4(l)(2)(B) or one of the special exclusions of section 4(l)(4). As stated, the *taxpayer must satisfy both* clauses (a) and (b) *to exclude itself* from coverage under the general exception of section 4(l)(2)(B): Commonwealth of Pennsylvania, Bureau of Employment Security v. Hecker and Co., 409 Pa. 117, 121, 122 (1962), affirming the opinion of this court, 78 Dauph. 354 (1962).

To determine whether Manville was an employe within the meaning of the act or an independent consultant as contended by appellant, we must examine both the new employment contract and the circumstances surrounding Manville's performance of services. For appellant to have been exempt from unem-

ployment tax on remuneration paid, Manville must have been free from control or direction of the performance of his services *both* under the written contract *and in fact.* It is immaterial whether any control over the performance of Manville's services was actually exercised. The mere right to exercise such control prevents an individual's remuneration from qualifying under the exclusionary provisions of section 4(l)(2)(B)(a). See Department of Labor & Industry v. Valley Forge Grinding Wheel Co., 83 Dauph. 322, 327 (1965).

When Mr. Howlett, assistant plant manager of Haddon Craftsmen, Inc., and "directly responsible for most manufacturing activities" was asked to describe briefly what Mr. Manville did for the company during the period in question, he replied:

"A. He conducted time studies, made recommendations on layout methods, consulted on performance efficiencies of personnel in the distribution center, suggested ways of improving efficiency, reducing costs—period. To give a general answer, he performed as—what I would consider—a consultant industrial engineer."

In reply to a question whether during this period the company exercised any control or supervision over the performance of Mr. Manville's services, Mr. Howlett said:

"I would say only in the respect that we assigned him an overall project and then evaluated his contribution to this project."

This witness further testified that Mr. Manville was not restricted from performing services of the same nature for any other individuals or firm while fulfilling the terms of his contract with appellant's subsidiary.

We are unable to reconcile this testimony with the basic agreement dated October 29, 1965, which

provides, in paragraph 11, that:

"11. Manville agrees that, during the term herein provided, he will neither undertake nor perform any work for other companies engaged in the manufacture and/or distribution of books . . ."

Mr. Howlett was asked:

"Q. Why was Mr. Manville's status changed on November 1, 1965, from that of an employee to that of an independent contractor? In other words, November 1, 1965, he was put under contract" . . .

"A. The company felt that Mr. Manville, who had been working for us for a number of years as an administrative engineer, in many areas, was becoming less effective in his role as an administrative engineer. It was felt that we should terminate his services to the company. However, it was recognized at that time that there were certain specific assignments of a consulting industrial engineering nature which could be made and which Manville could, perhaps, pursue and fulfill. We definitely felt also that after Manville was terminated that, should he be re-employed—re-engaged, excuse me—as a consultant, we would be able to evaluate better his services in terms of a specific profit contribution in the specific area, the Dunmore Distribution Center, to which he was assigned. We felt that in a period of, perhaps, 90 days, there were certain specific industrial engineering assignments which he could undertake for us. If he were able to make a substantial contribution to profit, it would be profitable for us to use him in this capacity. At the same time, we had been feeling some doubt as to the value of Mr. Manville's services and we recognized that, as a consultant, he would be forced to produce, and that should he not produce, we could limit his activities very definitely" . . .

"Q. When the contract with Mr. Manville was terminated on July 31, 1967, do you know why it wasn't

extended again, as it had been previously?

"A. Yes.

"Q. What was the reason?

"A. The reason was that we felt that the value of Mr. Manville's services was diminishing in proportion to the, let's say, return that was available. We felt we weren't getting our money's worth or we felt that he had reached the point of diminishing returns."

Mr. Howlett further testified that the type of work Mr. Manville contracted for was not performed during the period immediately after his leaving but that now it was being so performed. He also said that during the period in question Mr. Manville's services were performed "on our manufacturing floor at Dunmore Distribution Center"; that Manville maintained his own office in his home but worked much of the day at the plant; that he used his own facilities for writing reports, but the company allowed him to use a desk on their premises but he was required to provide his own equipment; that he could report for work at any time and leave at any time he desired; that he was not given instructions concerning his performance of the services that were contracted for because he was a professional consultant, having been hired 15 years previously by appellant and that "he was given instructions in terms of what was expected of him to accomplish and the general nature of the assignment he was to pursue."

Mr. Howlett said he had no knowledge whether the company ever supplied Manville with any business forms or stationery and he did not know whether any telephone was furnished to him. He said he "merely gave Mr. Manville a general project as to what it would like done" but that the company furnished him no materials and forbade him to continue to use its calculator equipment; that he continued on the various projects that were assigned to him, and that

*Manville worked 98 percent of his time in the Haddon Craftsmen, Inc. Distribution Center.*

Manville testified that he had a contract with International Textbook Company for his services for a period of one year from November 1950 to October 31, 1951, and thereafter it was extended on a yearly basis until either side wished to terminate it and give 60 days notice. He said that after October 31, 1965, his duties in regard to the new agreement were *identical* to those he previously performed.

"Q. (By Mr. Hosey, the Hearing Examiner) Mr. Manville, after November 1, 1965, did the type of service you rendered to this company change from the type which you rendered prior to November 1, 1965?

"A. Not at all, and I have evidence here that I worked on identically the same problems prior to November 1, 1965, as I did after. *Maybe a dozen projects continued right on.* On the projects, I could give you an example, a sales forecast had nothing to do with the distribution center, and it was given to me right before November 1, 1965, and I have a directive from Mr. Hull, and it continued right after November 1, 1965, the same job under his direction."[1]

Mr. Manville stated that he was supervised in the performance of his duties in the same manner as theretofore and that in the early spring of 1965 he was ordered "to work with Mr. Howlett"; that he reported to him at regular intervals and that Mr. Howlett was "the same man to whom I reported *after* November 1, 1965." He further testified:

"Q. After October 31, 1965, were you supervised in any manner in the performance of the terms of your contract?

"A. Let me say this. *Yes,* in that at least 100 requests were made of me giving me specific directions

---

1. Italics throughout ours unless otherwise noted.

as to what to do, and I have them here. I may also quote, let me read from the contract. The contract says, I quote, Item 1: 'Commencing November 1, 1965, and continuing for a ninety (90) day period thereafter, Manville will conduct a complete study in order to make specific recommendations in regard to the ways and means of improving Haddon's methods of handling, warehousing, packing, picking and shipping services in connection with the St. Martin's History Book Club and Publishing Division of International Textbook Company accounts with a view of reducing costs and improving gross margin and profit."

He further testified that prior to entering into the new agreement effective November 1, 1965, he was receiving $15,500 annually and that thereafter the gross amount paid to him was $16,000; that after he was told he had to employ his own secretary, appellant increased his remuneration from $4,000 every 90 days to $5,000, "including $1,000 for my secretary and any expenses." "I would say the salary I got *was just about equal* to what I got before. *The hours were identical,* the days of the week, the holidays." He said that it was in August 1965 that he was asked to "be an independent contractor, rather than an employee"; that the officials of the company didn't tell him why they desired this new arrangement and that he thought his work was satisfactory "because only a short time before, they called me over and gave me a $1,000.00 raise and told me what a good job I was doing, and on that premise I bought a home, and Mr. Hull and Mr. Wolfe, the president, informed me a few months before that I had contributed substantially to the profitability of Haddon. He put it in a letter to me."

Manville testified with respect to the bills or statements submitted by him to the firm: "He, Mr. Hull, told me the kind of statement he wanted me to sub-

mit,"[2] that his (Manville's) secretary typed it and that appellant company's subsidiary paid for the stationery and duplicated the same on its machines. Manville admitted that he signed seven different agreements which described his services as "consulting" services. He said, however, he has been a consultant since November 1, 1950, and was such when he first was employed by appellant in that year.

A reading of the entire record convinces us that during the period in question Mr. Manville was in the employ of appellant's subsidiary, Haddon Craftsmen, Inc. and was subject to its control. The agreement dated October 29, 1965, effective November 1, 1965, provided in paragraph 9:

"(9) If, at any time during the term hereinabove provided, Haddon shall be dissatisfied with the work being performed by Manville, it shall have the right to terminate this contract by tendering to Manville the sum or sums of money representing pro rata payment for work completed to date of termination as determined by Haddon. Upon such a tender being made by Haddon to Manville, all rights and duties of the parties hereto shall cease and neither party shall bear any further responsibility to the other hereunder nor have any further recourse."

It is noteworthy that 98 percent of the work done by Manville under the 1965 agreement was completed on the premises of Haddon Craftsmen, Inc., Distribution Center. There he performed the manifold duties assigned to him by appellant's subsidiary. We concur in the finding of the Bureau's hearing examiner that "Certain basic elements of control existed in this matter, in that the Petitioner could terminate the relationship of Manville at will. It controlled all of his

---

2. The statement contained the words: W. W. Manville, Management Consultant, and was billed to Haddon Craftsmen, Inc., Scranton, Pa.

assignments, designated the area in which he was to work and continued his assignment on projects which he had commenced prior to the original contract dated October 29, 1965."

Appellant also fails to meet the test required by clause (b) of section 4 (l)(2)(B) of the Unemployment Compensation Law, supra, because it has failed to show that Manville during the period beginning November 1, 1965, to July 31, 1967, was a consultant engineer "*customarily* employed in an *independently established* trade, occupation, profession or business." There is no evidence that Manville was in business for himself.

Since Manville's agreement was terminable at the will of appellant without notice and its duration was only for 90 days unless renewed, it would seem that if, in fact, he was an "independent contractor" he would have taken some action to establish himself as selfemployed.

The instant case is strikingly similar to Baldwin-Lima-Hamilton Corporation Appeal, 45 D. & C. 2d 155, 86 Dauph. 270 (1966), affirmed per curiam, sub nom. Commonwealth, Department of Labor and Industry, Bureau of Employment Security v. Baldwin-Lima-Hamilton Corporation, 212 Pa. Superior Ct. 562 (1968). There we also rejected the principal contentions now advanced by the present appellant. In that case, as here, the services of a longtime employe were terminated by his employer; the same individual was then rehired by the employer under a contract designating the employe as an "independent contractor" and there was no evidence whatever that the individual was engaged at any time in an independently established occupation or profession.

For the foregoing reasons, this appeal cannot be sustained. Consequently, we enter the following.

## ORDER

And now, December 19, 1969, the appeal of International Textbook Company is dismissed and the court hereby sustains the determination of the Department of Labor and Industry that during the period in question William W. Manville was in the employ of the appellant's subsidiary, the Haddon Craftsmen, Inc., and that the remuneration received therefor constituted "wages" subject to the contribution provisions of the Pennsylvania Unemployment Compensation Law.